# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**LEAD BANK**,
a Missouri banking corporation,

   Plaintiff,

v.

**MICHAEL W. MOORE,**
an adult individual,

**RAYMA S. TYSON,**
an adult individual,

And

**AMERICAN ENERGY
SOLUTIONS, INC.**

   Defendants.

Case Number: 12-cv-2067 CM/KMH

## COMPLAINT

  For its claims and causes of action against Michael W. Moore (**"Moore"**) Rayma

S. Tyson (**"Tyson"**), and American Energy Solutions, Inc. (**"American Energy"**),

Plaintiff Lead Bank (**"Lead Bank"**) states and allege as follows:

***The Parties***

  1. Lead Bank, formerly known as Garden City Bank, is a regional bank

organized and existing under the laws of the State of Missouri, having an office located at

200 North Third Street, in Garden City, Missouri.

  2. Moore is an adult individual who resides at and who may be served at

4731 West 78th Street in Prairie Village, Kansas.

3.    Tyson is an adult individual who resides at and who may be served at 7295 Covered Bridge Road in Platte City, Missouri.

4.    Defendant American Energy Solutions, Inc. is a Kansas corporation, with its principal place of business in Johnson County, Kansas.  American Energy may be served with process through its registered agent, Michael S. Martin, 4800 Rainbow Blvd Suite 100, Westwood, KS 66205.

### Jurisdiction and Venue

5.    This Court has subject matter jurisdiction over this matter pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1961, *et seq.* This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. Section 1367.

6.    Defendants are subject to personal jurisdiction in this district, in that the wrongful actions described herein all occurred within the State of Kansas. Venue is proper in this Court for this matter pursuant to 28 U.S.C. Section 1391(b)(2).

### American Energy and Defendants' Roles With Respect to American Energy

7.    American Energy is an energy consulting company formed in 1998, with offices in multiple states, including Kansas. American Energy provides energy consulting and sustainability services including conservation strategies, energy audits and tariff management, co-generation capacity development, project management, price hedging and other services.

8.    Moore was a co-founder of American Energy and was, at all times relevant to this Complaint, the President and Chief Executive Officer of American

Energy. American Energy is vicariously liable for the conduct of Moore as set forth in this Complaint

9.      Tyson was an officer, director, and employee of American Energy and, at all times relevant to this Complaint, was involved in the internal accounting activities of American Energy. American Energy is vicariously liable for the conduct of Tyson as set forth in this Complaint

***Lending Relationship Between Harrington Bank and American Energy; Acquisition of Participation Interest by Garden City Bank***

10.      On January 31, 2009, American Energy and Harrington Bank ("**Harrington**") entered into that certain commercial loan transaction (the "**Loan**"), pursuant to which Harrington agreed to lend to American Energy a principal amount not to exceed $2,500,000.00, in accordance with the terms of that certain Business Loan Agreement dated January 31, 2009 (the "**Loan Agreement**"). A copy of the Loan Agreement is attached hereto as Exhibit 1.

11.      Pursuant to the Loan Agreement, on January 31, 2009, American Energy signed and delivered to Harrington that certain Promissory Note in the original principal amount of $2,500,000.00 (the "**Note**"). A copy of the Note is attached hereto as Exhibit 2.

12.      The Loan was not the first commercial lending transaction entered into between American Energy and Harrington. The lending relationship between American Energy and Harrington had commenced in 2003, with certain loans made by Harrington to American Energy being refinanced from time to time, and with the final refinancing occurring in the form of the Loan, on January 31, 2009.

13.    In order to secure its obligations owed to Harrington, including obligations then existing or thereafter incurred, American Energy signed and delivered to Harrington certain Commercial Security Agreements dated, respectively: September 5, 2003; July 1, 2004; June 30, 2005; November 8, 2005; and June 30, 2006 (collectively, the **"Security Agreements"**).

14.    Pursuant to the Security Agreements, American Energy granted to Harrington a lien on and priority interest in, among other things, all of American Energy's accounts, inventory, general intangibles, and cash and non-cash proceeds of any of the foregoing.

15.    On March 27, 2009, Garden City Bank acquired a sixty percent participation interest in the Loan from Harrington.

16.    The maturity date of the Loan was January 31, 2010.

17.    On or about November 6, 2009, Arvest Bank ("Arvest") acquired from Harrington all of Harrington's right, title and interest in the Loan.

18.    In June 2010, Garden City Bank changed its name to Lead Bank.

19.    When Arvest acquired the Loan from Harrington on November 6, 2009, the Loan was current.

20.    After Arvest acquired the Loan in November 2009, Arvest commenced discussions with American Energy, through Moore, with respect to a potential extension of the maturity date of the Loan. During such discussions, Moore, on behalf of American Energy, repeatedly requested that Arvest extend the maturity date of the Loan.

21.    On December 10, 2009, Arvest engaged Collateral Inspection Service-CIS (**"CIS"**) to perform a review of AES's accounts receivable.

22.     CIS performed its work and issued a report to Arvest on February 4, 2010, at which time CIS reported to Arvest certain deficiencies in the manner in which American Energy was reporting its accounts receivable.  Arvest provided a copy of the report to Lead Bank on February 11, 2010.

23.     Arvest reported CIS' findings to American Energy, through Moore. Moore blamed Tyson for what he called any mistakes or irregularities in the reporting of accounts receivable.

24.     Arvest and American Energy entered into a forbearance agreement. Arvest's obligation to forbear thereunder expired on October 28, 2010.

25.     During the forbearance period, American Energy, at the request of Arvest, retained a turnaround management specialist, Iron Horse, LLC (**"Iron Horse"**) to act as a restructuring officer for American Energy and to keep American Energy's creditors, including Arvest and Lead Bank, informed with respect to American Energy's financial condition and operations.

26.     While serving as a restructuring officer for American Energy, Iron Horse reported to Arvest and Lead Bank in November 2010 that Iron Horse agreed with CIS' assessments of how American Energy had treated its accounts receivable, but concluded that the issues with American Energy's accounts receivable were more than mere irregularities, and likely involved fraud by Moore, Tyson and others.

### *Loan Document Provisions With Respect to Accounts Receivable of American Energy*

27.     Under the Loan Agreement, the obligation of Harrington to advance loan proceeds was contingent upon the amount of such advanced amounts not exceeding the "Borrowing Base" under the Loan Agreement.

28.    Under the Loan Agreement, "Borrowing Base" was defined as the lesser of (a) $2,500,000.00 or (b) 75 percent of all "Eligible Accounts."

29.    Under the Loan Agreement, American Energy represented and warranted that each "Account" used in calculating the Borrowing Base, would meet the requirements of an "Eligible Account" under the Loan Agreement.

30.    Under the Loan Agreement, the term "Account" includes accounts receivable. Under the Loan Agreement, the term "Eligible Account" states that the net amount of any Eligible Account shall exclude any returns, discounts, credits or offsets that may be owed by American Energy to a customer in connection with any specific account receivable owed to American Energy.

31.    In addition, under the Loan Agreement, Eligible Accounts expressly exclude: any account receivable the payment of which by American Energy's customer is conditional; any account receivable owed by a customer with respect to which American Energy had not yet delivered goods or with respect to which American Energy had not yet rendered services; and any account receivable aged more than 90 days.

**The Defendants' Wrongful Conduct**

32.    Following Iron Horse's examination of American Energy's operations and (the results of which were reported to Lead Bank in November 2010) Lead Bank discovered that American Energy had deliberately overstated the amount of its receivables and Eligible Receivables, as set forth below, and that Moore, Tyson and others had played roles in the deliberate misreporting and overstatements of American Energy's Receivables.

33.     Moore, as President and CEO of American Energy, and Tyson, as an employee director and/or officer of American Energy, engaged in various practices, as set forth below, to falsely inflate, in reports from American Energy, the amount of American Energy's accounts receivable, and the amount of such recievables that qualified as Eligible Receivables (the **"Account Inflation Scheme"**).

34.     The Account Inflation Scheme included the following practices engaged in by Defendants:

(a) generating invoices for amounts not supported by any purchase orders or customer contracts, and including the amounts of such invoices in its reports regarding receivables and Eligible Receivables;

(b) generating invoices that duplicated amounts previously billed to American Energy's customers, not sending such invoices to American Energy's customers, and then including such duplicated amounts in its reports regarding receivables and Eligible Receivables;

(c) generating invoices for amounts reflected in purchase contracts, but for which no goods had yet been shipped and for which no services had yet been rendered by American Energy, and including the amounts of such invoices in its reports regarding receivables and Eligible Receivables;

(d) treating accounts receivable as beginning to "age" from the date on which such receivables were actually due, rather than from the date on which such receivables were actually invoiced, so that some receivables that were more than 90 days due would appear to be less than 90 days due, and including the amounts of such receivables as receivables and Eligible Receivables in its reports; and

(e) assigning due dates to accounts receivable that were far into the future, rather than due dates that were American Energy's historical norm or due dates that were industry norm, and then treating the payment date (and not the invoice date) as the date on which such aging began, and then including such accounts receivable as receivables and Eligible Receivables in its reports.

35.    In perpetrating the Account Inflation Scheme, Defendants put into place and utilized a suffix numbering system for American Energy that enabled them to identify actual, collectible receivables and those receivables that were falsely reported as receivables and Eligible Receivables, but which in fact would not be collected or would likely not be collected.

36.    In perpetrating the Account Inflation Scheme, Defendants also had American Energy utilize "credit memos," which would be created when a true, actual receivable or Eligible Receivable was generated, but when such receivable had to actually replace a phantom or premature amount which was not yet a true "receivable" (but which had already been reported as a receivable and Eligible Receivable).

37.    As a result of the Account Inflation Scheme, the amounts of receivables and Eligible Receivables that Defendants reported were grossly inflated. On information and belief, in the years from 2007 through 2010, approximately $27,000,000.00 in ineligible or nonexistent accounts receivable were reported to Harrington, Arvest, and Lead Bank as receivables and Eligible Receivables.

38.    Lead Bank relied on American Energy, and on American Energy's officers, agents, and professionals, to be truthful and accurate in creating and submitting reports in which representations were made with respect to American Energy's accounts

receivable, and with respect to what accounts receivable were actually Eligible
Receivables.

39.    In acquiring a participation interest in the Loan, Lead Bank relied upon
such financial information provided by Defendants;

40.    The following amounts were reported by American Energy as receivables
and Eligible Receivables through its borrowing base certificates, A/R aging summaries
and other financial reports:

(a) as of December 31, 2006, the amount of $2,358,293.75;

(b) as of January 31, 2007, the amount of $2,694,657.83;

(c) as of February 28, 2007, the amount of $1,795,253.14;

(d) as of March 31, 2007, the amount of $1,706,535.95;

(e) as of April 30, 2007, the amount of $1,849,346.22;

(f) as of May 31, 2007, the amount of $1,935,133.14;

(g) as of June 30, 2007, the amount of $2,202885.04;

(h) as of July 31, 2007, the amount of $2,927,356.01;

(i) as of August 31, 2007, the amount of $3,088,114.37;

(j) as of September 30, 2007, the amount of $3,088,064.43;

(k) as of October 31, 2007, the amount of $3,110,644.16;

(l) as of November 30, 2007, the amount of $2,898,576.39;

(m) as of December 31, 2007, the amount of $2,688,216.74;

(n) as of January 31, 2008, the amount of $3,046,739.89;

(o) as of February 29, 2008, the amount of $3,414,763.99;

(p) as of March 31, 2008, the amount of $3,498,359.63;

(q) as of April 30, 2008, the amount of $3,403,988.25;

(r) as of May 31, 2008, the amount of $3,144,350.26;

(s) as of June 30, 2008, the amount of $3,366,222.86;

(t) as of July 31, 2008, the amount of $3,600,251.79;

(u) as of August 31, 2008, the amount of $3,941,421.03;

(v) as of September 30, 2008, the amount of $3,359,968.10;

(w) as of October 31, 2008, the amount of $4,147,884.42;

(x) as of November 30, 2008, the amount of $3,548,099.71; and

(y) as of December 31, 2008, the amount of $3,083,602.46;

(z) as of January 31, 2009, the amount of $3,112,755.55

(a)(a) as of February 28, 2009, the amount of $3,539,655.80

41.  The amounts reported as set forth above were false and inaccurate, due to the Account Inflation Scheme.

42.     Prior to the purchase of its participation interest in the loan, Lead Bank reviewed and relied, among other things, on American Energy's borrowing base certificates and A/R aging summaries for September, October, and November of 2008, as well as for January and February of 2009.

43.     Subsequent to Lead Bank's purchase of its interest in the Loan, the following amounts were reported by American Energy as receivables and Eligible Receivables through its borrowing base calculations, A/R aging summaries and other financial reports:

(a) as of March 31, 2009, the amount of $3,317,358.77;

(b) as of April 30, 2009, the amount of $4,251,851.23;

(c) as of May 31, 2009, the amount of $4,067,232.78;

(d) as of June 30, 2009, the amount of $4,667,800.47;

(e) as of July 30, 2009, the amount of $4,135,724.22;

(f) as of August 31, 2009, the amount of $3,706,864.80;

(g) as of September 30, 2009, the amount of $3,178,991.17;

(h) as of October 31, 2009, the amount of $3,114,143.87;

(i) as of November 30, 2009, the amount of $3,371,034.58;

(j) as of December 31, 2009, the amount of $3,207,859.60;

(k) as of January 31, 2010, the amount of $3,123,810.95;

(l) as of February 28, 2010, the amount of $3,041,640.49;

(m) as of March 31, 2010, the amount of $3,073,158.28;

(n) as of April 30, 2010, the amount of $3,244,790.11;

(o) as of May 31, 2010, the amount of $3,194,624.73;

(p) as of June 30, 2010, the amount of $2,919,082.32;

(q) as of July 31, 2010, the amount of $2,690,965.49;

(r) as of August 31, 2010, the amount of $3,000,672.48;

(s) as of September 30, 2010, the amount of $2,841,391.28; and

(t) as of October 14, 2010, the amount of $2,244,382.56.

44.    The amounts reported as set forth immediately above were false and inaccurate due to the Account Inflation Scheme.

***Plaintiffs' Loss***

45.    In February 2011, Arvest, in cooperation with American Energy, entered into a note sale agreement (the **"Note Sale"**) with Palo Verde Fund, L.P. (**"Palo Verde"**),

pursuant to which Arvest sold the Note to Palo Verde. Upon information and belief, Palo Verde simultaneously worked with American Energy, Moore and other American Energy representatives on a restructure of American Energy by which Palo Verde would obtain an ownership interest in American Energy, by which American Energy's operations would not be terminated, and by which American Energy's accounts receivable and other property would not be liquidated.

46.    The purchase price under the Note Sale was $1,200,000.00, with $1,000,000.00 of the purchase price being payable in cash, and the other $200,000.00 being payable pursuant to a promissory note delivered by Palo Verde to Arvest.

47.    Such sale was at a significant loss to both Arvest and Lead Bank.

48.    Accordingly, as a result of the individual and collective wrongful actions of the Defendants, Plaintiff Lead Bank has suffered significant losses in connection with the Loan.

## Count I – Fraud

49.    Plaintiff hereby incorporates by reference the preceding allegations of this Complaint, as though fully set forth herein.

50.    While engaged in the Account Inflation Scheme, Defendants prepared or assisted in preparing financial information and reports (including borrowing base certificates, A/R aging summaries and other financial reports) for the express purpose of such information and reports being presented to Arvest and its participants and potential participants.

51.    The financial information and reports Defendants provided to Arvest and Lead Bank included false representations regarding the amount of American Energy's accounts receivable, and what accounts receivable constituted Eligible Receivables.

52.    The false financial information and reports were made as statements of existing material fact.

53.    The false financial information and reports were generated and presented for the express purpose of inducing Arvest and Lead Bank, to act, or to refrain from acting, upon them.

54.    Defendants were aware that the false financial informtion and reports generated by them would be shared with and communicated to Lead bank, as a participant in the Loan.

55.    Lead Bank is a member of the class of persons whom defendants intended to receive and rely on the false financial informtion and reports

56.    Each Defendant herein was involved in generating, reviewing, and/or presenting such false financial information and reports.

57.    Defendants knew that the financial information and reports were false or, alternatively and at a minimum, acted recklessly in preparing, reviewing, and presenting financial information and reports that were in fact false.

58.    Defendants were aware that the false financial information and reports generated by them would be shared with and communicated to Lead bank, as a participant in the Loan.

59.     Defendants had a duty to disclose to Arvest and Lead Bank the truth about the accuracy of American Energy's accounts receivable, borrowing base certificates, A/R aging summaries and other financial reports, and failed to do so.

60.     Defendants knew that Arvest and Lead Bank, would rely on the financial information and reports in determining whether to make the Loan, whether to purchase an interest in the Loan, whether to make subsequent advances under the Loan, whether to declare the Loan in default at any given time, and whether to undertake, or not to undertake, certain other actions with respect to the Loan.

61.     Lead Bank reasonably relied on the representations made in American Energy's borrowing base certificates and A/R aging summaries for September, October, and November of 2008, and for January and February of 2009, on other financial information provided by Defendants, and on Defendants fraudulent omissions, in determining whether to purchase an interest in the Loan, and would not have purchased that interest but for such false representations and omissions.

62.     Lead Bank reasonably relied on the representations made in American Energy's borrowing base certificates and A/R aging summaries generated subsequent to March 27, 2009, on other financial information provided by Defendants, and on Defendants fraudulent omissions, in determining whether to cause Arvest to declare the Loan in default at any given time, and whether to undertake, or not to undertake, certain other actions with respect to the Loan.

63.     Lead Bank has suffered damages as a direct and proximate result of its reliance on Defendants false representations and omissions.

WHEREFORE, Plaintiff respectfully prays for the entry of judgment in its favor on this Count I, and jointly and severally against Defendants, for damages incurred as a result of Defendants' fraudulent misrepresentations, in an amount to be determined at trial, together with interest and costs, and for such other relief as the Court deems just and proper.

## Count II – Civil Conspiracy

64.     Plaintiff hereby incorporates by reference the preceding allegations of this Complaint, as though fully set forth herein.

65.     Defendants together constitute two or more persons.

66.     Defendants shared a common objective and sought to accomplish such objective, which was to overstate the amount of American Energy's receivables and Eligible Receivables to enable American Energy to obtain financing, including the Loan, to provide the appearance that American Energy was in compliance with the terms of the Loan Agreement and prior loan agreements, to cause Arvest and Lead Bank not to enforce their rights under the Loan, and to enable Defendants in the meantime to receive benefits from American Energy including salaries, distributions and/or other benefits.

67.     Defendants had a meeting of the minds in connection with the pursuit of their objective, and with regard to the dissemination of false statements contained in the financial information and reports.

68.     Defendants committed unlawful, overt acts in furtherance of their conspiracy, including in engaging in the fraudulent activity set forth herein and in preparing, generating, and submitting the false financial information and reports.

WHEREFORE, Plaintiff respectfully prays for the entry of judgment in its favor on this Count II, and jointly and severally against Defendants, for damages incurred as a result of Defendants' civil conspiracy, in an amount to be determined at trial, together with interest and costs, and for such other relief as the Court deems just and proper.

### Count III – RICO, 18 U.S.C. Section 1962(c)
### (Defendants Moore and Tyson)

69.     Plaintiff hereby incorporates by reference the preceding allegations of this Complaint, as though fully set forth herein.

70.     American Energy is an "enterprise" within the meaning of 18 U.S.C. Section 1961(4), which is engaged in, or the activities of which affect, interstate commerce.

71.     American Energy was at all times mentioned herein a continuing enterprise, in that it was used by Defendants, and other persons and entities, for their improper purposes, through a repeated pattern of supplying false information to Harrington and to other lenders (including Plaintiff) for the purpose of obtaining loans, receiving capital infusions, and otherwise receiving favorable economic treatment.

72.     American Energy is separate and distinct from the pattern of racketeering activity committed by the Defendants in the conduct of their affairs.

73.     Defendants committed numerous predicate acts of bank fraud, including acts in violation of 18 U.S.C. Section 1344, while conducting and participating in the conduct of American Energy's financial affairs, by creating, generating and submitting to Harrington, and to other lenders (including Plaintiff), American Energy's balance sheets, A/R aging summaries, borrowing base certificates, and other financial information and reports which overstated American Energy's accounts receivable.

74.    At various times, commencing at least in September 2008, and possibly earlier, and through December 2010, Defendants caused American Energy to submit false financial information and reports to its lenders, while at the same time Defendants caused American Energy to remit monies and other benefits to the Defendants and others in the form of salaries, distributions, fees, and loan repayments.

75.    The Defendants further engaged in predicate acts while conducting, and participating in, the financial affairs of American Energy, by making use of the United States mail and wires to perpetrate fraudulent misrepresentations in violation of 18 U.S.C. Sections 1341 and 1343, including:

(a) by transmitting borrowing base certificates and financial statements by mail or email to Harrington and Arvest; and

(b) by transmitting balance sheets, A/R aging summaries, and other financial information and reports by mail or email to Harrington and Arvest.

76.    The predicate acts set forth herein constitute a pattern of racketeering activity in that all such actions had the same purpose (causing the amount of American Energy's accounts receivable to be overstated so that American Energy could receive financing, cash infusions from investors, and other favorable financial treatment), had the same participants (the Defendants and other unnamed persons and entities), and had the same victims (lenders, including Harrington, Arvest and Lead Bank, and investors).

77.    The enterprise, and the predicate acts in furtherance of the enterprise, were continuing, in that they occurred over a period of years.

78.    Arvest and Lead Bank have suffered damages as a direct and proximate result of the Defendants' violations of 18 U.S.C. Section 1962(c), in that the Defendants'

actions caused Harrington to enter into the Loan, caused Lead Bank to purchase a

participation interest in the Loan, caused Arvest to purchase the Loan from Harrington,

and caused Harrington, Arvest and Lead Bank to take actions favorable to American

Energy and/or to refrain from taking actions not favorable to American Energy, all while

the Defendants benefited as a result thereof.

79.    As a result, Lead Bank has suffered damages in the aggregate in excess of

$575,000.00.

WHEREFORE, Plaintiff respectfully prays for the entry of judgment in its favor

on this Count III, and jointly and severally against Defendants, for damages incurred as a

result of Defendants' activities, in an amount to be determined at trial but in excess of

$575,000.00, together with treble damages, costs and attorneys fees, as provided pursuant

to 18 U.S.C. Section 1964, and for such other relief as the Court deems just and proper.

### Count IV – RICO, 18 U.S.C. Section 1962(d)
### (Defendants Moore and Tyson)

80.    Plaintiff hereby incorporates by reference the preceding allegations of this

Complaint, as though fully set forth herein.

81.    Defendants agreed amongst themselves to engage in the Account Inflation

Scheme, in order to induce Harrington, Arvest and Lead Bank to lend money to

American Energy, and/or to participate in such lending, to induce Harrington, Arvest and

Lead Bank to take specific actions, and to refrain from taking specific actions, to induce

other lenders to lend money to American Energy, to induce investors to infuse capital

into American Energy, and to otherwise induce lenders and investors to confer financial

benefit on American Energy.

82.    The Defendants were aware that the predicate acts set forth herein were part of a racketeering activity.

83.    Each Defendant herein actively participated in the perpetration of the predicate acts and/or were aware of the occurrence of the predicate acts, and each Defendant herein knew that the predicate acts were committed in furtherance of the improper enterprise.

84.    Arvest and Lead Bank suffered injury and damages as a direct and proximate result of Defendants' violations of 18 U.S.C. Section 1962(d), and the Defendants are liable to Plaintiff for such damages.

WHEREFORE, Plaintiffs respectfully pray for the entry of judgment in their favor on this Count IV, and jointly and severally against Defendants, for damages incurred as a result of Defendants' activities, in an amount to be determined at trial but in excess of $575,000.00, together with treble damages, costs and attorneys fees, as provided pursuant to 18 U.S.C. Section 1964, and for such other relief as the Court deems just and proper.

### Count V – Negligent Misrepresentation

85.    Plaintiff hereby incorporates by reference the preceding allegations of this Complaint, as though fully set forth herein.

86.    The Defendants' representations regarding American Energy's accounts receivable, made in the course of the Account Inflation Scheme, were false. The false representations, made in the financial information and reports were made as statements of existing material fact.

87.    Defendants made said representations in furtherance of their own financial and pecuniary interests.

88.    Defendants failed to use ordinary care in creating, reviewing and providing advice regarding the financial information and reports, and in communicating the information therein, and, as a result of such failure to use ordinary care, caused such representations to be false.

89.    Said representations were made with the intent of inducing others, including Harrington, Arvest and Lead Bank, to act upon them in the course of their respective businesses.

90.    Each Defendant was involved, at various times, in generating, reviewing, providing advice regarding and/or presenting the financial information and reports.

91.    Plaintiff reasonably relied on the representations contained in the financial information and reports in acquiring a participation interest in the Loan, and in making other decisions regarding the Loan.

92.    Plaintiff has suffered damages as a direct and proximate result of its reliance on the false representations contained in American Energy's financial information and reports.

WHEREFORE, Plaintiff respectfully prays for the entry of judgment in its favor on this Count V, and jointly and severally against Defendants, for damages incurred as a result of Defendants' negligent misrepresentations, in an amount to be determined at trial, together with interest and costs, and for such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury in the above captioned matter for all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby requests that the trial in the above captioned matter be held at the United States District Court in Kansas City, Kansas.

PAYNE & JONES, CHARTERED

Christopher J. Sherman KS # 20379
Michael B. Lowe KS # 14691
Roger H. Templin KS # 15604
11000 King
Overland Park, Kansas 66210
Telephone: (913) 469-4100
Facsimile: (913) 469-8182
csherman@paynejones.com
mlowe@paynejones.com
rtemplin@paynejones.com

ATTORNEYS FOR PLAINTIFFS

# BUSINE S LOAN AGREEMENT (ASSE  ,ASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,500,000.00 | 01-31-2009 | 01-31-2010 | 15547 | 5510 | 11349 | 102 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** AMERICAN ENERGY SOLUTIONS, INC.
10601 Mission Road, Suite 210
Leawood, KS 66206

**Lender:** Harrington Bank, A Division of Los Padres Bank
Kansas Commercial Loan Operations
6300 Nall Avenue
Shawnee Mission, KS 66202
(866) 261-2551

---

**THIS BUSINESS LOAN AGREEMENT (ASSET BASED)** dated January 31, 2009, is made and executed between **AMERICAN ENERGY SOLUTIONS, INC.** ("Borrower") and Harrington Bank, A Division of Los Padres Bank  ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of January 31, 2009, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.** The following person or persons are authorized, except as provided in this paragraph, to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **MICHAEL W. MOORE, President; and Rayma S. Tyson, Corporate Secretary. Bi-Weekly reporting of the Borrowing Base.**

**LINE OF CREDIT.** Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.** Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.** Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.** If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.** Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.** To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any



**EXHIBIT** ___1___

**Security Interest.** Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at CHIEF EXECUTIVE OFFICE OF BORROWER OR WHERE EVER LOCATED. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered Bi-Weekly reporting of the Borrowing Base.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**Remittance Account.** Borrower agrees that Lender may at any time require Borrower to institute procedures whereby the payments and other proceeds of the Accounts shall be paid by the Account Debtors under a remittance account or lock box arrangement with Lender, or Lender's agent, or with one or more financial institutions designated by Lender. Borrower further agrees that, if no Event of Default exists under this Agreement, any and all of such funds received under such a remittance account or lock box arrangement shall, at Lender's sole election and discretion, either be (1) paid or turned over to Borrower; (2) deposited into one or more accounts for the benefit of Borrower (which deposit accounts shall be subject to a security assignment in favor of Lender); (3) deposited into one or more accounts for the joint benefit of Borrower and Lender (which deposit accounts shall likewise be subject to a security assignment in favor of Lender); (4) paid or turned over to Lender to be applied to the Indebtedness in such order and priority as Lender may determine within its sole discretion; or (5) any combination of the foregoing as Lender shall determine from time to time. Borrower further agrees that, should one or more Events of Default exist, any and all funds received under such a remittance account or lock box arrangement shall be paid or turned over to Lender to be applied to the Indebtedness, again in such order and priority as Lender may determine within its sole discretion.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the Initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Fees and Expenses Under This Agreement.** Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Missouri. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 10801 Mission Road, Suite 210, Leawood, KS 66206. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than 20 days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, compiled by a certified public accountant satisfactory to Lender.

**Interim Statements.** As soon as available, but in no event later than 20 days after the end of each month, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower.

**Tax Returns.** As soon as available, but in no event later than 15 days after the applicable filing date for the tax reporting period ended, Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.** Bi-Weekly reporting of Borrowing Base.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Minimum Income and Cash flow Requirements.** Borrower shall comply with the following cash flow ratio requirements:

**Debt Service Coverage Ratio Ratio.** Maintain a ratio of Debt Service Coverage Ratio in excess of **1.500 to 1.000**. For purposes of this covenant, the Minimum Debt Service Coverage Ratio shall be determined as the Borrower's Earnings before Interest, Taxes,

Depreciation and Amortization (EBITDA) minus Other Expense, as those terms are defined under Generally Accepted Accounting Principles, divided by Total Interest Expense plus Amortized Principal for the period reviewed.

**Additional Requirements.** During the term of this loan, the Borrower agrees to maintain a Minimum Net Worth of $1,500,000.00, to be measured effective 12-31-2009 and thereafter. For purposes of this covenant, the Minimum Net Worth shall be determined as the Borrower's Equity accounts minus any loans or advances to owners of the Borrower or their affiliates (except in the ordinary course of business), as those terms are defined under Generally Accepted Accounting Principles.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| MICHAEL W. MOORE | Unlimited |
| GREGORY E. ELAM | Unlimited |
| SHAWN D. RASH | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender within one (1) day after the end of each Bi-Weekly, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons,

# BUSINESS LOAN AGREEMENT (ASSET BASED)
## (Continued)

lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or

forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after receiving written notice from Lender demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include all reasonable costs incurred in the collection of the Loan, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Kansas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Kansas.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Johnson County, State of Kansas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability

of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means AMERICAN ENERGY SOLUTIONS, INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of  (1)  **$2,500,000.00**   or (2) **75.000%** of the aggregate amount of Eligible Accounts.

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Kansas.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

(2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with  Borrower or its shareholders, officers, or directors.

(3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(5) Accounts which are subject to dispute, counterclaim, or setoff.

(6) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(7) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(8) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(9) Accounts which have not been paid in full within **90 days** from the invoice date.

(10) For purposes hereof, Net Eligible Receivables are defined as the Gross Accounts Receivable of borrower less:

    i)   Any receivables due from affiliates related party or affiates receivables;

    ii)   Any receivables more than 90 days from invoice date;

    iii)   All receivables from an account debtor who has more than 25% of their total receivables more than 90 days from invoice date.

    iv)   Lock Box of Receivables.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Harrington Bank, A Division of Los Padres Bank, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by AMERICAN ENERGY SOLUTIONS, INC. in the principal amount of $2,500,000.00 dated January 31, 2009, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

| Borrower's Initials | NO ORAL AGREEMENTS. This written agreement is the final expression of the agreement between Lender and Borrower and may not be contradicted by evidence of any prior oral agreement or of a contemporaneous oral agreement between Lender and Borrower. |
|---|---|
| | NONSTANDARD TERMS. The following space contains all nonstandard terms, including all previous oral agreements, if any, between Lender and Borrower: |
| Lender's Initials | |
| | By initialing the boxes to the left, Lender and Borrower affirm that no unwritten oral agreement exists between them. |

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED JANUARY 31, 2009.

BORROWER:

AMERICAN ENERGY SOLUTIONS, INC.

By: _____
MICHAEL W. MOORE, President of AMERICAN
ENERGY SOLUTIONS, INC.

LENDER:

HARRINGTON BANK, A DIVISION OF LOS PADRES BANK

By: _____
Mark R. Larrabee, President

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,500,000.00 | 01-31-2009 | 01-31-2010 | 15547 | 5510 | 11349 | 102 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** AMERICAN ENERGY SOLUTIONS, INC.
10601 Mission Road, Suite 210
Leawood, KS 66206

**Lender:** Harrington Bank, A Division of Los Padres Bank
Kansas Commercial Loan Operations
6300 Nall Avenue
Shawnee Mission, KS 66202
(866) 261-2551

COPY

**Principal Amount: $2,500,000.00** **Date of Note: January 31, 2009**

PROMISE TO PAY. AMERICAN ENERGY SOLUTIONS, INC. ("Borrower") promises to pay to Harrington Bank, A Division of Los Padres Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million Five Hundred Thousand & 00/100 Dollars ($2,500,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

PAYMENT. Borrower will pay this loan in full immediately upon Lender's demand. If no demand is made, Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 31, 2010. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning February 28, 2009, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any unpaid collection costs; then to any late charges; then to any accrued unpaid interest; and then to principal. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

VARIABLE INTEREST RATE. The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Prime Rate as published in the Wall Street Journal. When a range of rates has been published, the higher of the rates will be used (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each day. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. The interest rate to be applied to the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.000 percentage points over the Index, rounded up to the nearest 0.125 percent, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 6.500% per annum based on a year of 360 days. NOTICE: Under no circumstances will the interest rate on this Note be less than 6.500% per annum or more than the maximum rate allowed by applicable law.

INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

PREPAYMENT; MINIMUM INTEREST CHARGE. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $100.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Harrington Bank, a Division of Los Padres Bank, Commercial Loan Operations, 6300 Nall Avenue Shawnee Mission, KS 66202.

LATE CHARGE. If a payment is 11 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment or $10.00, whichever is greater.

INTEREST AFTER DEFAULT. Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding a 2.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

DEFAULT. Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or

EXHIBIT 2

## PROMISSORY NOTE
### (Continued)

a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the Indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**COLLATERAL.** Borrower acknowledges this Note is secured by Commercial Security Agreements dated July 1, 2004, June 30, 2005, November 8, 2005, and June 30, 2006, describing all of the following now owned or hereafter acquired: Accounts, Inventory and the products thereof, general intangibles, deposit accounts, chattel paper, instruments, investment property, documents, equipment, including, but not limited to, machinery, furniture, fixtures "trade fixtures", and motorized equipment, accessories and accessions thereto, substitutions therefore, cash and non-cash proceeds in any form of all of the foregoing, proceeds of proceeds, including, but not limited to, all books and records relating thereto.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else who is not Lender's salaried employee to help collect this Note if Borrower does not pay. Borrower will be liable for all reasonable costs incurred in the collection of this Note, including but not limited to, court costs, attorneys' fees and collection agency fees, except that such costs of collection shall not include recovery of both attorneys' fees and collection agency fees.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Kansas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Kansas.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Johnson County, State of Kansas.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized, except as provided in this paragraph, to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority:  **MICHAEL W. MOORE, President; and Rayma S. Tyson, Corporate Secretary.**  Bi-Weekly reporting of the Borrowing Base. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**ADDITIONAL PROVISION.** Borrower and Lender acknowledge  that all provisions within the documents executed to date which refer or contain agreements to arbitrate are hereby deemed deleted in their entirety and otherwise, unless further specifically modified herein the terms and conditions of the original documents and such documents shall remain in full force and effect.D.

**PRIOR NOTE.** Borrower became obligated to Lender  with a Promissory Note dated July 1, 2004 in the original amount of $200,000.00, together with all renewals, modifications, replacements, substitutions, refinancings, consolidations and extensions  for the promissory note or agreement thereof .

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** This Note is payable on demand. The inclusion of specific default provisions or rights of Lender shall not preclude Lender's right to declare payment of this Note on its demand. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, protest and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification

## PROMISSORY NOTE
### (Continued)

Page 3

Is made. The obligations under this Note are joint and several.

| Borrower's Initials | NO ORAL AGREEMENTS. This written agreement is the final expression of the agreement between Lender and Borrower and may not be contradicted by evidence of any prior oral agreement or of a contemporaneous oral agreement between Lender and Borrower. |
|---|---|
| | NONSTANDARD TERMS. The following space contains all nonstandard terms, including all previous oral agreements, if any, between Lender and Borrower: |
| Lender's Initials | |
| | By initialing the boxes to the left, Lender and Borrower affirm that no unwritten oral agreement exists between them. |

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

AMERICAN ENERGY SOLUTIONS, INC.

By: _____
   MICHAEL W. MOORE, President of AMERICAN
   ENERGY SOLUTIONS, INC.